1

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   625 3RD STREET ASSOCIATES, L.P.,
     a California limited partnership,

11                                                    No. C 09-00564 WHA
                    Plaintiff,
12                                                    No. C 09-03820 WHA
        v.                                            (consolidated)
13

14   BOARD OF THE NATIONAL CREDIT                     **ORDER DENYING**
     UNION ADMINISTRATION, in its capacity            **PLAINTIFF'S MOTIONS FOR**
15   as liquidating agent for the Kaiperm Federal     **PARTIAL SUMMARY**
     Credit Union, KAIPERM FEDERAL                    **JUDGMENT AND**
16   CREDIT UNION, a federal credit union,            **DEFENDANT NCUA'S**
     ALLIANT CREDIT UNION, an Illinois                **MOTION FOR PARTIAL**
17   corporation, and STANLEY ABRAMS, an              **SUMMARY JUDGMENT**
     individual,

18                  Defendants.

19   _____/

20                          **INTRODUCTION**

21          This action involves a dispute over a real-estate purchase-and-lease-back agreement of a

22   property located at 2101 Broadway in Oakland.  Plaintiff moves for partial summary judgment

23   against defendant Stanley Abrams on plaintiff's fourth and fifth claims and against defendant

24   Board of the NCUA on plaintiff's first and second claims.  These motions are **DENIED.**

25   Defendant Board of the NCUA moves for partial summary judgment on plaintiff's first and

26   second claims.  This motion is also **DENIED.**

27                          **STATEMENT**

28          This case arises from Kaiperm Federal Credit Union's alleged breach of a purchase-and-

     lease-back agreement with plaintiff 625 3rd Street Associates, LP.  The office space was for the

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    credit union's store.  Approximately one year after entering the lease agreement, Kaiperm ceased

2    paying rent under the lease when the National Credit Union Administration initiated an

3    involuntary liquidation of Kaiperm.  This case involves a dispute over who, if anyone, is liable

4    under the lease agreement.

5            Plaintiff is a limited partnership that was formed in 1967 for the purpose of acquiring a

6    property at 625 3rd Street in San Francisco.  In December 2006, plaintiff reached terms for the

7    sale of this property.  The sale did not close until July 2007 in order to give plaintiff time to find

8    replacement properties to be used in a Section 1031 exchange to defer capital gains taxes.

9    Beginning in early 2007, plaintiff's asset manager Ron Kaufman Companies (RKC) through its

10   principals Ron Kaufman and Brian Perlman  reviewed hundreds of potential replacement

11   properties, including the property at 2101 Broadway that is at issue in this lawsuit (Glaessner

12   Decl. Exh. 5 at 30–39).

13           Kaiperm Federal Credit Union was a federally chartered credit union formed in 1957.  It

14   had purchased the property at 2101 Broadway in 2003, and after substantial renovations moved

15   into the property in 2006 (*id.* at 55).

16           Throughout 2006, Kaiperm had negative profitability.  According to an internal

17   assessment in January 2007, since the early part of 2005 Kaiperm "experienced a rapidly

18   declining asset base; a significant decline in loan production; negative profitability; net operating

19   expense well above its peer group; purchase of fixed assets that has exceeded the five percent

20   required by the National Credit Union Administration (NCUA); and significant turnover in both

21   upper and middle management, and staff" (Wiener Decl. Exh. 126).  As a consequence, Kaiperm

22   was "under intense pressure from the NCUA and in general to rectify its financial situation in

23   short order" (*ibid.*).

24           The NCUA is the federal agency that charters and supervises federal credit unions.  The

25   NCUA, under the management of the NCUA Board, may transfer credit unions with significant

26   and critical problems — such as financial, operational or managerial problems — into its special

27   actions division.  In January 2006, Kaiperm was transferred into the special actions division

28

2

United States District Court

For the Northern District of California

1    (Wiener Decl. Exh. 125).  As a result of its transfer to the special actions division, Kaiperm was

2    subject to a heightened level of regulatory review and oversight by NCUA.

3          Kaiperm was assigned a problem case officer — Bruce Lum — who monitored Kaiperm's

4    status, wrote monthly status reports and "Documents of Resolution" ("DORs") that set forth

5    corrective measures that Kaiperm needed to take, and had the responsibility to determine if and

6    when Kaiperm would be stable enough to be transferred out of the special actions division.  Lum

7    met regularly with Kaiperm's management and board, who had the responsibility to implement

8    the corrective measures set forth in the DORs (Wiener Decl. Exh. A at 12–13, 15, 18–19, 26,

9    33–34).

10          By mid-2006, the NCUA had issued its first examination report to Kaiperm since its

11   transfer to the special actions division.  When Kaiperm's management did not respond quickly,

12   the NCUA urged Kaiperm's board of directors to replace top management.  In October 2006,

13   Stanley Abrams was hired as the interim CEO.  In November 2006, Scott Bolster was hired as

14   interim CFO.  They developed a plan to address Kaiperm's operating losses (Glaessner Decl.

15   Exh. DD).  In February and March 2007, Abrams and Bolster began to evaluate the advantages

16   and disadvantages of selling Kaiperm's building.  Kaiperm's ownership of the property exceeded

17   the NCUA's fixed assets ratio requirement that no more than five percent of a credit union's

18   assets could be tied up in fixed assets (Glaessner Decl. Exh. B at 54–55).  According to

19   Kaiperm's board of directors and listing broker, the sale of the property was intended to increase

20   liquidity, improve Kaiperm's balance sheet and improve its financial situation (Wiener Decl. Exh.

21   G at 42, Exh. I at 74, Exh. J at 19).

22          Acting on behalf of plaintiff, RKC learned in early 2007 about a possible sale-leaseback

23   of 2101 Broadway in Oakland (Glaessner Decl. Exh. 5 at 47).  RKC decided to pursue the

24   property after touring the building in early April 2007 and being favorably impressed by the

25   quality of the offices and the tenant improvements (*id.* at 55).  In a report to plaintiff, RKC noted

26   that "[i]t is the nature of the current real estate environment that we must be quick on our feet to

27   find and secure attractive properties ahead of other investors, of which there is a seemingly

28

3

endless supply" (Glaessner Decl. Exh. N).  Neither RKC nor plaintiff had previously been

involved in a sale-leaseback transaction (Wiener Decl. Exh. M at 25, Exh. N at 70).

RKC asked Kaiperm to provide its income statement and the balance sheet for review

(Wiener Decl. Exh. M at 62–63).  Stanley Abrams and David Moore, who had replaced Scott

Bolster as Kaiperm's CFO in March 2007, responded that Kaiperm's financial statements were

online at NCUA's website (Wiener Decl. Exh. D at 92–94, Exh. M at 63–68).

Kaiperm's quarterly statements of financial condition — known as "5300 call reports" —

and financial performance reports were maintained online at NCUA's website (Wiener Decl. Exh.

A at 147–52).  These financial statements showed that Kaiperm had operating losses for recent

quarters, including a loss of over $900,000 in the first quarter of 2007 (Glaessner Decl. Exh. 1).

The NCUA website did not disclose that Kaiperm had a special action designation from the

NCUA, was subject to a DOR, or had significant management turnover.  But Stanley Abrams

testified at his deposition that he told his team to make sure that any document plaintiff needed to

complete its due diligence were provided (Bishop Decl. Exh. 1 at 145).

According to the depositions of RKC's principals Ron Kaufman and Brian Perlman,

concurrent with its review of Kaiperm's 5300 call reports RKC specifically asked Moore and

Abrams about Kaiperm's projected financial status and whether Kaiperm had any problems about

which plaintiff should be made aware (Wiener Decl. Exh. M at 77–78, Exh. N at 68–69).  Moore

and Abrams replied that Kaiperm was stable, in good shape, and that the 5300 call reports

accurately reflected Kaiperm's financial condition (*ibid.*).  According to Kaufman's sworn

deposition testimony, Stanley Abrams and Kaiperm's attorney Richard Bruzzone said that

Kaiperm was in "great shape" (Wiener Decl. Exh. M at 88) and on that basis, plaintiff did not

require Kaiperm to provide a security deposit for the transaction.

Abrams' deposition testimony is that he did not say or imply that Kaiperm was in good

financial condition, had a strong future, or was stable (Bishop Decl. Exh. 1 at 143–44).  He

instead claims that he told Perlman and Kaufman that Kaiperm was doing its best to turn itself

around (*id.* at 132–37).

United States District Court

For the Northern District of California

1    Kaiperm's listing broker Barry Cohn stated at his deposition that he recalled David Moore

2    at some point in time responding to a question about how was business with "We're having a

3    profitable quarter or "Our customer base is growing in this quarter," or "that kind of commentary"

4    (Wiener Decl. Exh. J at 55).  RKC never hired a financial consultant or CPA to review Kaiperm's

5    financial statements or the real estate transaction at issue (Wiener Decl. Exh. M at 137–38,

6    188–90; Exh. N. at 145).

7    On April 25, 2007, RKC issued a letter of intent offering to purchase Kaiperm's property

8    under a sale and leaseback (Glaessner Decl. Exh. V).  A revised letter of intent was signed on

9    May 15, 2007.  It provided for an $8 million purchase price and a 15-year lease.  According to

10   Kaiperm's analysis in August 2007, the property without the lease component "would be valued

11   at something closer to $200/square foot or $3.3 million" (Wiener Decl. Exh. 63).

12   The May 15 letter of intent stated, "[Kaiperm's] obligations under the Purchase

13   Agreement shall be conditioned on the review and approval of this transaction by [Kaiperm's]

14   board of directors and the Regional Director of the National Credit Union Administration"

15   (Wiener 2nd Decl. Exh. 121 ¶3).  In August 2007, Stanley Abrams wrote to Kaiperm's board that

16   NCUA "gave us the green light on August 6" (Wiener Decl. Exh. 63).

17   The parties dispute whether Kaiperm actually obtained such approval.  When Kaiperm

18   asked Bruce Lum to approve the leaseback transaction, he responded that NCUA had no

19   regulation or process to grant such approval (Wiener Decl. Exh. A at 46–49).  His concern was

20   that the lease be an operating lease, not a capital lease, and he concluded that the transaction was

21   an operating lease (*ibid.*).  He stated that he "did not give approval, final or otherwise.  And I

22   wouldn't be authorized to give approval" (*id.* at 51).  Defendant NCUA nevertheless contends

23   that its permission was necessary not for plaintiff's protection but merely to ensure that

24   defendants complied with NCUA regulations governing sale and leaseback standards.  NCUA

25   argues that it was sufficient for purposes of the agreement that NCUA inform Kaiperm it was

26   satisfied those standards were met.

27   The deal also provided for a period of due diligence of 30 business days after receipt of

28   the due diligence materials.  Kaiperm's listing broker Barry Cohn delivered all due diligence

5

1    materials by May 21, 2007 (Glaessner Decl. Exh. X).  These materials did not include financial

2    documents.  They focused instead on the physical condition of the property.

3         On July 27, 2007, plaintiff and Kaiperm executed a purchase and sale agreement which

4    contained the terms and conditions of the sale of the property.  Included in the PSA was a list of

5    the due diligence materials plaintiff sought for review and approval as a condition precedent to

6    plaintiff's purchase of the property (Oke Decl. Exh. 3 at § 2.1(b) and B).  Exhibit B of the PSA

7    listed nine items that plaintiff sought to review, including copies of "as built" plans for the

8    improvements made to the property, maintenance agreements, licenses and permits and current

9    tax bills and insurance policies.  The due diligence materials requested did not include any

10   financial documents or information regarding Kaiperm (*ibid.*).

11        The PSA included the following relevant warranties (*id.* at § 3.1):

12            (a) [Kaiperm] has not (i) made a general assignment for the benefit
              of creditors, (ii) filed any voluntary petition in bankruptcy or
13            suffered the filing of any involuntary petition by [its] creditors, (iii)
              suffered the appointment of a receiver to take possession of all, or
14            substantially all, of [Kaiperm's] assets, (iv) suffered the attachment
              or other judicial seizure of all, or substantially all, of [Kaiperm's]
15            assets, (v) admitted in writing its inability to pay its debts as they
              come due, or (vi) made an offer or settlement, extension or
16            composition to its creditors generally.
              . . . .
17
              (g) To the best of [Kaiperm's] knowledge, there is no litigation,
18            action, suit, arbitration, claim, proceeding or government
              investigation at law or in equity pending or threatened with respect
19            to the Property or against [Kaiperm] which would prevent
              [Kaiperm] from performing its obligations hereunder.
20
          Section 3.5 of the PSA stated that plaintiff had a "full opportunity to inspect and
21
     investigate each and every aspect of the Property" including all matters of "material significance
22
     affecting the Property."  The PSA also included an integration clause (*id.* § 9.2) at  stating:
23
              This Agreement, together with the Exhibits hereto, contains all
24            representations, warranties and covenants made by the Buyer and
              Seller and constitutes the entire understanding between the parties
25            hereto with respect to the subject matter hereof.  Any prior
              correspondence, memoranda or agreements are replaced in total by
26            this Agreement together with the Exhibits hereto.

27        The lease agreement also contained an integration clause (Oke Decl. Exh. 4 ¶22).

28

                                          6

United States District Court
For the Northern District of California

The parties dispute the extent to which Kaiperm's financial condition materially worsened between May and August 2007. In May 2007, Kaiperm began to formulate a stabilization plan (Wiener Decl. I at 51–52). At a board meeting on May 24, there was discussion of the commencement of NCUA's complete audit of Kaiperm, of past errors in lending practices that required Kaiperm's books to be corrected, of continued loss of membership, and of the need to stabilize the management team (Wiener Decl. Exh. 129). Also in May 2007, Bruce Lum predicted to Stanley Abrams that loan loss projections would continue to increase in the future due to Kaiperm's portfolio of subprime first mortgage home equity loans (Wiener Decl. Exh. A at 106). However, he did not anticipate that Kaiperm's net worth would fall below 6% by the year's end, which was the trigger for a "net worth restoration plan," the next step in NSCUA oversight (Glaessner Decl. Exh. I at102–03).

According to the deposition testimony of Stanley Abrams, in June 2007 Kaiperm used its credit lines to meet its obligations "to some extent" in order to ensure that it had adequate liquidity to meet its obligations (Wiener Decl. Exh. C at 184). On June 25, 2007, Kaiperm's board met with Bruce Lum regarding the necessity for Kaiperm to obtain permanent senior management due to the overwhelming cost of interim personnel (Wiener Decl. Exh. A at 92–94). Lum concluded that if permanent staff could not be found, Kaiperm would have to merge with another credit union to survive (*id.* at 103–04). In July and August, Kaiperm's board and senior management discussed various options including possible merger as a solution if permanent management could not be found (*id.* at 116–17). Nevertheless, Kaiperm's negative profitability actually improved from May to August 2007 compared to the first four months of the year (Glaessner Decl. Exh. FF).

The leaseback transaction closed on August 31, 2007. Kaiperm became a rent-paying tenant at the property. It made all payments as agreed on the lease from the time the lease agreement was executed through the time of its liquidation in September 2008.

In his deposition, Stanley Abrams testified that he informed plaintiff that Kaiperm was looking for a merger partner due to the economy and declining property values (Wiener Decl. Exh. C at 166). Effective September 26, 2008, the NCUA placed Kaiperm into involuntary

United States District Court

For the Northern District of California

1   liquidation (Wiener Decl. Exh. O).  Its assets and certain liabilities were assumed by Alliant

2   Credit Union in a purchase and sale in which Alliant paid NCUA approximately $88 million.  Its

3   lease for the property at 2101 Broadway was not assumed by Alliant.  NCUA, in its role as

4   liquidating agent, has authority pursuant to 12 U.S.C. 1787(c)(1) to repudiate contracts which in

5   its discretion it determines to be burdensome.  On October 23, 2008, the NCUA repudiated the

6   lease agreement for 2101 Broadway.

**ANALYSIS**

8       Summary judgment must be granted under FRCP 56 when "the pleadings, the discovery

9   and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

10  material fact and that the movant is entitled to judgment as a matter of law."  A district court must

11  determine, viewing the evidence in the lights most favorable to the nonmoving party, whether

12  there is any genuine issue of material fact.  *Giles v. General Motors Acceptance Corp.*, 494 F.3d

13  865, 872 (9th Cir. 2007).  A genuine issue of fact is one that could reasonably be resolved, based

14  on the factual record, in favor of either party.  A dispute is "material" only if it could affect the

15  outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

16  248–49 (1986).

17      **1.      PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT.**

18      Plaintiff moves for summary judgment against defendants Abrams and NCUA (as

19  liquidating agent for Kaiperm) on claims under California law for affirmative misrepresentation

20  and concealment.  To establish affirmative misrepresentation, plaintiff must show that (1)

21  defendant made a knowingly false misrepresentation (2) with the intent to deceive or induce

22  reliance by plaintiff, (3) that plaintiff justifiably relied on the representation, and (4) that plaintiff

23  suffered damage as a result.  *Wilkens v. National Broadcasting Co., Inc.*, 71 Cal.App.4th 1066,

24  1081 (1999).  To establish concealment, plaintiff must show: (1) defendant's concealment or

25  suppression of a material fact, (2) defendant's duty to plaintiff to disclose the fact, (3) defendant's

26  intent to conceal or suppress the material fact with the further intent to suppress, (4) plaintiff's

27  ignorance of the fact and assertion that he would have acted differently had he known of the

28

8

1   concealed or suppressed fact, and (5) resulting damage.  *Marketing West, Inc. V. Sanyo Fisher*

2   *(USA) Corp.*, 6 Cal.App.4th 603, 612–13 (1992).

3        Plaintiff asserts that defendants concealed Kaiperm's troubled financial status and

4   affirmatively misrepresented its financial and operational status for the purpose of inducing

5   plaintiff to invest $8 million in a 15-year leaseback deal that defendants knew Kaiperm could not

6   honor.  Plaintiff claims that defendants have admitted that they failed to disclose (1) that NCUA

7   did not approve the transaction, (2) that Kaiperm had been placed into the special actions division

8   by the NCUA, and (3) that Kaiperm was assigned a problem case officer.

9        But plaintiff has not shown that the material facts as to any of these claims are undisputed.

10  As noted above, defendants argue that they interpreted Bruce Lum's statements that the form of

11  the lease as an operating lease was sufficient NCUA approval for purposes of the agreement.

12  Even if this was objectively incorrect, it is enough to raise an issue of fact for the jury as to

13  whether defendants made a *knowingly* false misrepresentation or concealed a material fact

14  regarding Kaiperm's financial and operational status.

15       As to defendants' failure to disclose that Kaiperm had been placed in the special actions

16  division and assigned a problem case officer, there is at least an issue of fact as to what

17  defendants affirmatively represented to plaintiff, precluding summary judgment on the affirmative

18  misrepresentation claim.  Abrams' deposition testimony stated that he told his staff to provide

19  plaintiff with any information it needed.  This creates an issue of fact as to whether defendants

20  concealed or suppressed any material fact, precluding summary judgment as to concealment.

21  Moreover, it is disputed whether Kaiperm's financial condition before the close of escrow in

22  August 2007 was so dire that defendants knew Kaiperm could not honor the leaseback deal.

23       For the foregoing reasons, plaintiff's motions for summary judgment are **DENIED**.

24       **2.      NCUA'S MOTION FOR SUMMARY JUDGMENT.**

25       NCUA moves for summary judgment on the grounds that plaintiff's claims are barred by

26  the *D'Oench, Duhme* doctrine and 12 U.S.C.  1787(p)(2).

27       In *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942), a securities dealer sold bonds to

28  a bank.  The issuer of the bonds later defaulted on the payments.  To allow the bank not to carry

any past-due bonds on its books, the securities dealer executed promissory notes to the bank.  The receipts for the notes, signed by the bank's president, stated that the notes would not be called for payment and that interest paid would be refunded.  In a purchase and assumption transaction, the Federal Deposit Insurance Company later acquired from the bank a $5000 note, executed by the securities dealer in renewal of the original notes.  When the FDIC demanded payment on the $5000 note, the maker claimed that he owed nothing because of the bank's agreement not to call the original notes.  The FDIC had been unaware of the receipts until after it demanded payment. *Id.* at 454.

Citing a federal policy to protect the FDIC and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which the FDIC insures or to which it makes loans, the Supreme Court held that the undisclosed agreement not to demand payment would not be allowed as a defense.  "If the secret agreement were allowed as a defense in this case the maker of the note would be enabled to defeat the purpose of the statute [creating the FDIC] by taking advantage of an undisclosed and fraudulent agreement . . . which the maker of the note made possible."  *Id.* at 461.

The *D'Oench, Duhme* doctrine thus is a principle of equitable estoppel that permits bank examiners to rely on the records of a bank in evaluating the bank's financial condition, by protecting the bank authorities from suits founded on undisclosed conditions or deceptive documents.  As codified in 12 U.S.C. 1787(p)(2), the doctrine states that the liquidating agent of an insured credit union is not bound by any agreements which tend to diminish an asset of the NCUA Board as liquidator unless the agreement is, *inter alia*, in writing.  NCUA argues that plaintiff's claims for concealment and misrepresentation are based on alleged *oral* statements/agreements by defendants, so they must fail.

Plaintiff argues that the *D'Oench, Duhme* doctrine does not apply because its claims are "free-standing tort claims," which may be maintained against the federal banking authority even though the claim may not be revealed by examination of the bank's records.  A free-standing tort claim is one not related to matters normally reflected in the records of regular banking transactions, such as a slip and fall claim.  *Brookside Associates v. Rifkin*, 49 F.3d 490 (9th Cir.

1995).  In *Vernon v. RTC*, 907 F.2d 1101 (11th Cir. 1990), the Eleventh Circuit held that the *D'Oench, Duhme* doctrine did not apply where the plaintiffs who bought stock in a savings and loan that failed shortly after the transaction sued for common law fraud on the grounds that they were provided with fraudulent financial records.  In *Brookside*, by contrast, the Ninth Circuit held that the *D'Oench, Duhme* doctrine *did* apply where a plaintiff brought an action alleging misrepresentations in the bank's appraisal value of property which induced it to buy condominiums.  *Brookside*, 49 F.3d at 497.  The Ninth Circuit held that plaintiff's claim related to one of the most regular of banking transactions: the making of a loan by the bank for the purchase of real estate.

Even though the present action involves a real estate transaction, it does so outside of the traditional borrower/lender relationship in which the bank has loaned money to the plaintiff.  Here Kaiperm was the *obligor* on the lease transaction.  Some jurisdictions have held that the *D'Oench, Duhme* doctrine has been expanded to encompass claims beyond the traditional borrower/lender relationship.  In *Bartram v. FDIC*, 235 Cal.App. 1749 (1991), for example, the California Court of Appeal held the doctrine barred claims against the FDIC as receiver for a failed savings and loan for fraud, negligent misrepresentation and rescission where the savings and loan allegedly made false oral promises to plaintiffs to induce them to enter a real estate exchange contract.  *See also Hall v. FDIC*, 920 F.2d 334, 339 (6th Cir. 1990) (acknowledging that the "logic of *D'Oench* should still apply to protect the FDIC" even when the FDIC's interest in an asset ceases to exist).

But the Ninth Circuit has never held that the *D'Oench, Duhme* doctrine applies to such a situation like in the present matter and defendant NCUA has not convincingly shown that it would do so.  For this reason, defendant NCUA's motion for summary judgment on plaintiff's first and second claims is **DENIED.**  This is without prejudice to defendant NCUA renewing the argument in a motion for judgment as a matter of law after all the evidence has been heard at trial and the application of the *D'Oench, Duhme* doctrine in this somewhat unusual circumstance may be better evaluated.

**CONCLUSION**

For the reasons stated above, plaintiff's motions for summary judgment are **DENIED**. Defendant NCUA's motion for summary judgment on plaintiff's first and second claims is **DENIED WITHOUT PREJUDICE** to renewal after the evidence has been received at trial.

**IT IS SO ORDERED.**

Dated: June 25, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

12